1

2

3                                                                 O

4

5

6

7

8                  UNITED STATES DISTRICT COURT

9                 CENTRAL DISTRICT OF CALIFORNIA

10

11  LUIS ESCALANTE, on behalf of  )  Case No. CV 14-03021 DDP (PJWx)
    himself and all others        )
12  similarly situated,           )
                                  )
13                 Plaintiff,     )  **ORDER GRANTING DEFENDANT'S MOTION**
                                  )  **FOR SUMMARY JUDGMENT IN PART AND**
14       v.                       )  **DENYING MOTION IN PART**
                                  )
15  CALIFORNIA PHYSICIANS'        )
    SERVICE dba BLUE SHIELD OF    )
16  CALIFORNIA,                   )
                                  )
17                 Defendants.    )
                                  )
18  _____  )

19

20       As described in this court's earlier Orders, Plaintiff Luis

21  Escalante ("Plaintiff") was covered by a group health insurance

22  policy issued by Defendant Blue Shield of California ("Defendant"

23  or "Blue Shield").  (Decl. Michael C. Godino, Ex. 1 at 2.)

24  Plaintiff alleges that he suffers from degenerative disc disease

25  ("DDD") and that his doctor recommended he undergo artificial disc

26  replacement ("ADR") surgery instead of a more traditional lumbar

27  fusion.  (Compl. at ¶ 16-17.)  Plaintiff requested authorization

28  from Blue Shield to undergo ADR surgery, but Blue Shield denied

1  Plaintiff's request after finding ADR surgery was excluded from
2  coverage as investigational because "the efficacy of [ADR] has not
3  been validated by the peer reviewed literature."[1]  (Decl. Godino,
4  Ex. 28 at 484.)  Plaintiff appealed the decision to both Blue
5  Shield and the California Department of Managed Health Care, and
6  was again denied.  (Id., Ex. 30 at 494.)  Plaintiff brought suit,
7  on behalf of a now certified class, challenging Blue Shield's ADR
8  policy under the Employee Retirement Security Act of 1974 ("ERISA"
9  ).  Blue Shield now moves for summary judgment.

10    **II.  Legal Standard**

11    Summary judgment is appropriate where the pleadings,
12  depositions, answers to interrogatories, and admissions on file,
13  together with the affidavits, if any, show "that there is no
14  genuine dispute as to any material fact and the movant is entitled
15  to judgment as a matter of law." Fed. R. Civ. P. 56(a). A party
16  seeking summary judgment bears the initial burden of informing the
17  court of the basis for its motion and of identifying those portions
18  of the pleadings and discovery responses that demonstrate the
19  absence of a genuine issue of material fact. See Celotex Corp. v.
20  Catrett, 477 U.S. 317, 323 (1986). All reasonable inferences from
21  the evidence must be drawn in favor of the nonmoving party. See
22  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 242 (1986).  If the
23  moving party does not bear the burden of proof at trial, it is
24  entitled to summary judgment if it can demonstrate that "there is

25

26
27     [1] The plans at issue exclude services that are "Experimental
or Investigational in Nature."  Those services are defined to
include products and services "which are not recognized in
28  accordance with generally accepted professional medical standards
as being safe and effective . . . ."

an absence of evidence to support the nonmoving party's case."
*Celotex*, 477 U.S. at 323.

Once the moving party meets its burden, the burden shifts to the nonmoving party opposing the motion, who must "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256.  Summary judgment is warranted if a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. A genuine issue exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," and material facts are those "that might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248. There is no genuine issue of fact "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

It is not the court's task "to scour the record in search of a genuine issue of triable fact." *Keenan v. Allan*, 91 F.3d 1275, 1278 (9th Cir.1996). Counsel has an obligation to lay out their support clearly. *Carmen v. San Francisco Sch. Dist.*, 237 F.3d 1026, 1031 (9th Cir.2001). The court "need not examine the entire file for evidence establishing a genuine issue of fact, where the evidence is not set forth in the opposition papers with adequate references so that it could conveniently be found." *Id.*

**III. Discussion**

A.   Standard of Review

1    There is no dispute that the plan at issue here is governed by
2  the Employee Retirement Security Act of 1974 ("ERISA" ).   ERISA
3  "permits a person denied benefits under an employee benefit plan to
4  challenge that denial in federal court."   29 U.S.C.A. §
5  1132(a)(1)(B); Metropolitan Life Ins. Co. v. Glenn, 554 U.S. 105
6  (2008).   "In determining the appropriate standard of review for
7  actions under [ERISA], we are guided by principles of trust law."
8  Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989).
9  Courts should "analogize a plan administrator to the trustee of a
10  common-law trust" and "consider a benefit determination to be a
11  fiduciary act (i.e., an act in which the administrator owes a
12  special duty of loyalty to the plan beneficiaries)."   Metropolitan
13  Life Ins. Co. v. Glenn, 554 U.S. 105, 111 (2008).
14    "Principles of trust law require courts to review a denial of
15  plan benefits 'under a de novo standard' unless the plan provides
16  to the contrary," in which case a more deferential standard of
17  review is appropriate.   Id. at 111 (quoting Firestone, 489 U.S. at
18  115).   Therefore, the "starting point" in determining the
19  applicable standard of review is whether the terms of the ERISA
20  plan "unambiguously grant discretion to the administrator."   Abatie
21  v. Alta Health & Life Ins. Co., 458 F.3d 955, 962-63 (9th Cir.
22  2006).   When the plan does not confer discretionary authority to
23  the plan administrator to determine benefit eligibility or
24  interpret the terms of the plan, a court must review the denial of
25  benefits de novo (the default standard of review).   Id. at 963; see
26  Metropolitan Life Ins. Co., 554 U.S. at 111.   "But if the plan does
27  confer discretionary authority as a matter of contractual
28

1   agreement, then the standard of review shifts to abuse of

2   discretion." Abatie, 458 F.3d at 963.

3       Here, the plan "Contract" is defined as the contract between

4   Blue Shield and Plaintiff's employer, Provident Health. (Decl.

5   Godino, Ex. 1 at 6, 8; see generally decl. Leslie Crawford, Ex. 3

6   at 17.)  That contract expressly incorporates the plan's Evidences

7   of Coverage ("EOC"). (Decl. Crawford, Ex. 3 at 21.)  The "Plan

8   Interpretation" section of Plaintiff's plan's EOC provides that

9   "Blue Shield shall have the power and discretionary authority to

10  construe and interpret the provisions of the contract, to determine

11  the benefits of the Contract, and determine eligibility to receive

12  Benefits under the Contract." (Decl. Godino, Ex. 1 at 5.)  All of

13  the class members' EOCs include this provision. (Id.; Decl. Joan

14  Russo, Ex. 4 ¶ 3.)

15      Plaintiff alleges that the Summary Plan Description ("SDP")

16  contradicts the "Plan Interpretation" section of the EOC by

17  designating Plaintiff's employer, not Blue Shield, as the "Plan

18  Administrator" with sole fiduciary discretionary authority over the

19  plan. (Opp. at 14:19-24; decl. Luis Escalante, Ex. 1 at 11.)  At

20  the same time, however, the SDP's "Welfare Plan Information"

21  section states that Blue Shield has discretionary authority over

22  all Health Maintenance Organization medical plans in California,

23  such as Plaintiff's.  The section provides:

24          Blue Shield of California is the named claims fiduciary for
            the Health Maintenance Organization medical plans in
25          California, as defined in ERISA. Blue Shield . . . has
            discretionary authority to make decisions on claim appeals and
26          to interpret the terms of the Health Maintenance plans.

27  (Supp'l. Decl. Godino, Ex. 34 at 546.)

28

1    Regardless, the SDP, upon which Plaintiff relies, itself

2 provides that "[i]f any conflicts arise between this summary and

3 the Plan documents and contracts, the Plan documents and contract

4 as interpreted by the *Plan Administrator* and fiduciaries will

5 govern." (Decl. Escalante, Ex. 1 at 10 (emphasis in original).)

6 "Plan documents and contract" refers to the contract between

7 Plaintiff's employer and Blue Shield.  That contract expressly

8 incorporates the EOC, which identifies Blue Shield, by name, as

9 having the discretionary authority to interpret the contract and

10 make benefits determinations.  Accordingly, this court will review

11 Blue Shield's denial of benefits for abuse of discretion.

12    B.   Scope of Review and Level of Skepticism

13    Blue Shield argues that this court should review Blue Shield's

14 coverage decision for abuse of discretion, tempered by a low degree

15 of skepticism or no skepticism at all.  The manner in which a court

16 applies the abuse of discretion standard of review depends on

17 whether the plan administrator is operating under a conflict of

18 interest.  Montour v. Hartford Life & Accident Ins. Co., 588 F.3d

19 623, 629 (9th Cir. 2009).  Where there is no conflict, "judicial

20 review of a plan administrator's benefits determination involves a

21 straightforward application of the abuse of discretion standard"

22 and the plan administrator's decision can be upheld if it is

23 "grounded on any reasonable basis." Id. at 629.  "In other words,

24 where there is no risk of bias on the part of the administrator,

25 the existence of a 'single persuasive medical opinion' supporting

26 the administrator's decisions can be sufficient to affirm, so long

27 as the administrator does not construe the language of the plan

28 unreasonably or render its decision without explanation." Id. at

1  629-30 (quoting <u>Boyd v. Bert Bell/Pete Rozelle NFL Players Ret.</u>
2  <u>Plan</u>, 410 F.3d 1173, 1179 (9th Cir. 2005)); <u>see</u> <u>Conkright v.</u>
3  <u>Frommert</u>, 559 U.S. 506, 130 (2010).

4       Where, however, the plan administrator operates under a
5  conflict of interest, the abuse of discretion standard "requires a
6  more complex analysis," in which the reviewing court must weigh the
7  conflict as one factor in determining whether there was an abuse of
8  discretion.  <u>Id.</u> at 629-630, 632.  An insurer that acts as both the
9  plan administrator and the funding source for benefits operates
10 under a structural conflict of interest.  <u>Abatie</u>, 458 F.3d at 965
11 (citing <u>Tremain v. Bell Indus. Inc.</u>, 196 F.3d 970, 976 (9th Cir.
12 1999)).  A structural conflict of interest exists because, where
13 the plan administrator is also the insurer, "benefits are paid out
14 of the administrator's own pocket, so by denying benefits, the
15 administrator retains money for itself." <u>Montour</u>, 588 F.3d at 630.
16 Blue Shield acknowledges that a structural conflict of interest
17 exists here.

18      Where a conflict exists, abuse of discretion review must be
19 informed by the nature, extent and effect the conflict has on the
20 decision-making process, discounting the deference given to the
21 plan administrator's decision accordingly.  <u>Abatie</u>, 458 F.3d at
22 967; <u>Salomaa v. Honda Long Term Disability Plan</u>, 642 F.3d 666, 674
23 (9th Cir. 2011).  This review requires "a case-by-case balance," in
24 which "[a] district court, when faced with all the facts and
25 circumstances, must decide . . . how much or how little to credit
26 the plan administrator's reason for denying insurance coverage."
27 <u>Abatie</u>, 458 F.3d at 968.  The Ninth Circuit has described this
28 multi-factor balancing test as follows:

> A court may weigh a conflict more heavily if, for example, the administrator provides inconsistent reasons for denial, . . . fails adequately to investigate a claim or ask the plaintiff for necessary evidence, . . . fails to credit a claimant's reliable evidence, . . . or has repeatedly denied benefits to deserving participants by interpreting plan terms incorrectly or by making decisions against the weight of evidence in the record.

Id. at 968-69; See also Montour, 588 F.3d at 630 ("Other factors that frequently arise in the ERISA context include the quality and quantity of the medical evidence, whether the plan administrator subjected the claimant to an in-person medical evaluation or relied instead on a paper review of the claimant's existing medical records, whether the administrator provided its independent experts 'with all of the relevant evidence,' and whether the administrator considered a contrary [ agency] determination.").

Review for abuse of discretion is limited to the record before the plan administrator. Abatie, 458 F.3d at 970; Jebian v. Hewlett-Packard Co. Employee Benefits Org. Income Prot. Plan, 349 F.3d 1098, 1110 (9th Cir. 2003). However, a reviewing court "may consider evidence beyond that contained in the administrative record that was before the plan administrator" to determine "how much weight to give a conflict of interest under the abuse of discretion standard." Abatie, 458 F.3d at 970. A court's subsequent abuse of discretion analysis must then be "tempered by skepticism commensurate with the plan administrators' conflict of interest," while resting solely upon the administrative record. Id. at 955, 970.

In arguing for heightened skepticism, Plaintiff points to extra-record evidence that (1) the ProDisc L received Pre-Market Approval ("PMA") from the FDA, (2) "Blue Shield has repeatedly

1  denied lumbar ADR as investigational[,]" and (3) Blue Shield

2  provided inconsistent reasons to justify its lumbar ADR policies.

3  (Opp. at 15.)  This court's analysis of Blue Shield's bias is

4  complicated somewhat by Plaintiff's insistence that all of his

5  extra-record evidence is intended to demonstrate not only bias, but

6  also that Blue Shield's decision is "unsupportable" on the merits.

7  (Opp. at 23:24-23:3.)  For the reasons stated above, such evidence

8  may only be considered in establishing a level of skepticism with

9  which to approach a later merits determination.  Abatie, 458 F.3d

10  at 970.

11      In 2006, the FDA granted the ProDisc L PMA as a Class III

12  medical device. (Decl. Branko Kopjar at ¶ 11.) The FDA granted PMA

13  after a two-year study that involved 286 subjects and found that

14  lumbar ADR was superior to fusion in "properly chosen patients" by

15  "multiple clinical criteria," including overall success, function

16  and pain.  (Id. at ¶¶ 64, 65; decl. Godino, Ex. 9 at 134.)  PMA is

17  the most stringent and difficult regulatory approval to obtain from

18  the FDA.  (Decl. Kopjar at ¶ 11.)  The FDA must approve the study

19  design before granting approval. (Id. at ¶ 12.)  Plaintiff argues

20  that the conflict between the FDA's conclusions and Blue Shield's

21  shows bias on the latter's part.  Although, as this Court stated in

22  its Order denying Plaintiff's Motion for Summary Judgment, the

23  insurance plan does not import or adopt FDA definitions or

24  standards, Blue Shield's decision to rely upon the 2007 TEC

25  assessment and CTAF conclusions, despite FDA approval and the

26  underlying two year study, is consistent with bias.  (Order Denying

27  Plaintiff's Motion for Summary Judgment at 6.)  Although the TEC

28  and CTAF assessments discounted the two-year study, Plaintiff has

submitted evidence of ties between Blue Shield and TEC and CTAF that call into question the independence of those organizations and the validity of their criticisms of the two-year study.  On the question of bias, such evidence must be viewed "through the lens of the traditional rules of summary judgment" in favor of the non-moving party.  <u>Nolan v. Heald College</u>, 551 F.3d 1148, 1155 (9th Cir. 2009).

Plaintiff has also submitted evidence that more than 100,000 ProDisc-L devices have been implanted worldwide.  (Decl. Jack E. Zigler at ¶ 25.)  Lumbar ADR is performed at several reputable medical centers across the country, including Stanford, Cedars-Sinai, the University of California at San Francisco, the University of California at San Diego, and Yale.  (<u>Id.</u> at ¶¶ 26, 31.)  The North American Spine Society ("NASS") recommends coverage for lumbar ADR when certain "stringent" criteria are met.  (<u>Id.</u>, Ex. 7 at 90-91.)  The American Pain Society gives lumbar ADR a "B" grade for the first two-years following implantation and an "I" grade thereafter, which means that "[t]he panel found insufficient evidence to recommend for or against the intervention."  (<u>Id.</u>, Ex. 24 at 502).  The International Society for the Advancement of Spine Surgery (ISASS), an industry group, recommends coverage for lumbar.  (Supp'l Decl. Godino,  Ex. 43 at 624-25.)

Other studies, including those by Wei et al., Thavaneswaran et al., and Rao et al., conclude that lumbar ADR is superior to, or similar to, fusion across various metrics in their respective meta-analyses studies.  (Decl. Kopjar, Ex. 12 at 212; Ex. 13 at 223; Ex. 14 at 230.)  Granted, Wei et al. note "problems" with the underlying trials, and both Thavaneswaran et al. and Rao et al.

note concerns about the long-term consequences of lumbar ADR. (<u>Id.</u>, Ex. 12 at 221; Ex. 13 at 226; Ex. 14 at 238.) It is unclear to the court whether Blue Shield had access to, asked for, or addressed, this evidence, the credibility of which is itself not entirely clear, and is therefore more properly addressed at trial.

Plaintiff further asserts, and Blue Shield does not appear to dispute, that Blue Shield has repeatedly denied ADR-related benefits to plan participants. Plaintiff argues that these refusals weigh in favor of heightened skepticism. (Opp. at 15.) These repeated, and indeed blanket, denials are, perhaps, unsurprising in light of Blue Shield's lumbar ADR policy. At the same time, however, the <u>Abatie</u> court specifically cited repeated denials of benefits as indicative of bias where an insurer denies benefits "by interpreting plan terms incorrectly or by making decisions against the weight of evidence in the record." <u>Abatie</u>, 458 F.3d at 968-69. Given the uncertainty about the extent of the record here (discussed further <u>infra</u>), let alone the weight of the evidence therein, this factor cannot weigh in favor of summary judgment on the question of bias.

Lastly, Plaintiff contends that Blue Shield "has provided 'inconsistent reasons' to justify its policy on lumbar ADR during the class period." (Opp. at 18:20-21.) As discussed in further detail below, Blue Shield did admittedly change the form of and, indeed, the evidentiary basis for, its ADR policy. Although all forms of the policy consistently deemed ADR to be investigational, the reasons motivating the changes are in dispute, and could support an inference of bias against coverage.

1    In sum, the broader set of evidence beyond the administrative

2  record, taken in the light most favorable to plaintiff, could

3  support an inference that Blue Shield's coverage decisions were

4  tainted by more than a modicum of bias.  Because triable issues

5  remain, Blue Shield's motion for summary judgment is denied,

6  insofar as it seeks a determination that this court will review

7  Blue Shield's decision for abuse of discretion with little or no

8  skepticism.

9    C.    Whether Defendant Abused Its Discretion

10    Because triable issues remain as to the level of skepticism

11  warranted here, this Court cannot grant summary judgment regarding

12  Blue Cross' abuse of discretion, or lack thereof.  See Montour, 588

13  F.3d at 631; See also Burke v. Pitney Bowes Inc. Long-Term

14  Disability Plan, 544 F.3d 1016, 1027 (9th Cir. 2008).  Blue Shield

15  has, however, submitted evidence suggesting that it did not abuse

16  its discretion.  Blue Shield has a process to determine whether

17  medical devices are "recognized in accordance with generally

18  accepted professional medical standards as being safe and

19  effective," or are excluded from coverage as "investigational."

20  (Decl. Godino, Ex. 12 at 164, 167.)  Products and services that are

21  not so recognized fall under the plan's definition of "Experimental

22  or Investigational in Nature."  Blue Shield's technology assessment

23  ("TA") policy sets forth five criteria for evaluating devices and

24  other technologies:

25      [1] The technology must have final approval from the
        appropriate government regulatory bodies.

26                              ***
        [2] The scientific evidence must permit conclusions
27      concerning the effect of the technology on health outcomes
        . . . .

28

- The evidence should consist of well-designed and well-conducted investigations published in peer-reviewed journals. The quality of the body of studies and the consistency fo the results are considered in evaluating the evidence.
- The evidence should demonstrate that the technology can measure or alter the physiological changes related to a disease, injury, illness, or condition. In addition, there should be evidence or a convincing argument based on established medical facts that such measurement or alteration affects health outcomes.

[3] The technology must improve the net health outcomes.

- The technology's beneficial effects on health outcomes should outweigh any harmful effects on health outcomes.

[4] The technology must be as beneficial as any established alternatives.

***

[5] The improvement must be attainable outside investigational settings.

***

(Id.)

Blue Shield implements written medical policies for those devices based on its determinations regarding these five criteria. (Id. at 164-66, 168, 171-72; id., Ex. 13 at 193:17-194:2.)

At all times during the class period, Blue Shield has had a medical policy defining lumbar ADR as investigational and, consequently, excluded from coverage. (Decl. Godino, Ex. 7, 14-17.) Up until July 2014, Blue Shield's policies were adopted using a multi-step process. A team of nurses and a licensed physician (the medical director assigned to that policy) first conducted a review of the available evidence on the device in question and created a draft policy. (Decl. Godino, Ex. 13 at 182:23-25, 183:3-5, 189: 2-6; Ex. 12 at 166.) The proposed policy and all of the materials cited in it were then sent to the Blue Shield Medical Policy Committee who reviewed the materials, applied the five

13

criteria outlined above, and decided whether they agreed with the draft policy. (Id., Ex. 13 at 178:9-179:10, 182:17-183:5, 183:22-25, 184: 19-23; 189:2-6; Ex. 12 at 166.)  The assigned medical director then presented the draft policy at the next quarterly committee meeting where the committee voted on whether to approve the proposed policy. (Id., Ex. 13 at 176:21-181:12, 182:23-183:2; Ex. 12 at 166.)  As of July 2014, Blue Shield bases its medical policies, including its policy on lumbar ADR, on medical reference policies created by the Blue Cross Blue Shield Association ("BCBSA").  (Id., Ex. 12 at 166-67; Ex. 13 at 184:18-185:17.)

From April 18, 2010 (the start of the class period) through March 4, 2012, Blue Shield's lumbar ADR policy stated that: "Artificial intervertebral discs are considered **investigational** for all indications."  (Id., Ex. 14 at 222 (emphasis in original).) This policy considered 25 references, but relied largely on a 2007 Technology Evaluation Center ("TEC") Assessment issued by BCBSA, as well as assessments issued by the California Technology Assessment Forum ("CTAF").  (Id., Ex. 14 at 222-26, 230-32; Ex. 12 at 166.)

The 2007 TEC Assessment was prepared by BCBSA's Center for Clinical Effectiveness, which employs the same five technology assessment criteria as Blue Shield.  (Id., Ex. 20 at 340-41; Ex. 18 at 317:22-318:19; Ex. 21 at 358-59, Ex. 5 at 42-43.)  The 2007 TEC Assessment criticized a clinical study that measured the safety and effectiveness of the ProDisc-L, an artificial disc used in lumbar ADR procedures, two years post-surgery ("two-year study").[2]  (Decl.

---

[2]This two-year study led to the Food and Drug Administration's ("FDA") approval of the ProDisc-L.  (Decl. Kopjar at ¶ 12.)  The two-year study involved 286 subjects and found that lumbar ADR was
(continued...)

1    Branko Kopjar at ¶ 11; decl. Godino, Ex. 21 at 357-59, 375.)  The

2    2007 TEC Assessment also analyzed results from six case series

3    reports and one small non-randomized comparison study of the

4    ProDisc-L.  (Decl. Godino, Ex. 21 at 371-72.)  Based on its review,

5    the 2007 TEC Assessment found that lumbar ADR failed criteria 2, 4

6    and 5 and recommended that it remain investigational.  (Id., Ex.

7    21.)

8         CTAF is an independent organization, although it receives a

9    donation from the Blue Shield of California Foundation, which is a

10   fundraising wing of Blue Shield for charitable purposes.  (Id., Ex.

11   13 at 196:8-197:12.)  CTAF's February 2007 Assessment on lumbar ADR

12   used the same five technology assessment criteria as Blue Shield

13   and BCBSA, concluding that criteria 1 through 3 were met, but not

14   criteria 4 or 5.[3]  (Id., Ex 6. at 66-81.)  The 2007 CTAF Assessment

15   also criticized the two-year study regarding blinding, lack of

16   information on subject drop-outs and lack of information regarding

17   "unknown . . . long-term risks."  (Id. at 79.)

18        From March 5, 2012 through December 14, 2014, Blue Shield

19   merged its lumbar ADR and spinal fusion policies.  (Id., Ex. 15-

20   16.)  The combined policy stated: "Based on the lack of long term

21   efficacy and safety in comparison to standard spinal fusion

22   techniques, lumbar artificial disc replacement (arthroplasty) is

23

24        [2](...continued)
     superior to fusion in "properly chosen patients" by "multiple
25   clinical criteria," including overall success, function and pain.
     (Id. at ¶¶ 64, 65; decl. Godino, Ex. 9 at 134.)
26

27        [3]The CTAF stated that it remained unclear whether the
     "possible benefits of disc replacement with an artificial disc
28   outweigh the attendant surgical risks and the possibility of long-
     term device failure."  (Decl. Godino, Ex. 6 at 80.)

considered **investigational**." (<u>Id.</u>, Ex. 15 at 238; Ex. 16 at 259 (emphasis in original).)  Blue Shield based its spinal fusion medical policy on a policy issued by Triad Healthcare Musculoskeletal Health Services ("Triad"), a company with which Blue Shield collaborates. (<u>Id.</u>, Ex. 15 at 235; Ex. 13 at 214:14-20.)  Triad's own policy shows that it had reviewed 38 published materials in formulating the ADR section of its policy. (<u>Id.</u>, Ex. 22 at 397-401; Ex. 23 at 420-24.)

From 2014 to 2015, Blue Shield maintained its previous policy statement, implementing only minor changes. (<u>Id.</u>, Ex. 17 at 298; Ex. 7 at 92.)  BCBSA also published an updated TEC Assessment that analyzed a study that followed the subjects of the two-year study out to five years ("five-year study"). (Decl. Kopjar at ¶ 13.)  The 2014 TEC Assessment criticized the five-year study, concluding that there was a high risk of bias as well as lack of clarity in how the non-inferiority margin was chosen and why there was a "large loss to follow-up" in the fusion group. (Decl. Godino, Ex. 5 at 41, 49-50, 55.)  Consequently, BCBSA concluded that the evidence failed to satisfy the second criterion of BCBSA's Medical Policy Program policy, which is identical to the second criterion of Blue Shield's TA policy, because the evidence was not "well-designed and well-conducted." (<u>Id.</u>, Ex. 20 at 343; Ex. 12 at 167; Ex. 5 at 42-43.)

Blue Shield's most recent medical policy, effective May 29, 2015, compared the success of lumbar ADR using various artificial disc devices. (<u>Id.</u>, Ex. 7 at 92.)  The policy noted that only two of the devices, the Pro-Disc L and the Charité, received FDA approval. (<u>Id.</u> at 93.)  The Charité, however, has since been

1  withdrawn from the market, and its successor, the INMOTION, is not

2  marketed in the United States.  (Id. at 101.)

3      Plaintiff relies largely upon extra-record evidence to argue

4  that the BSBSA, CTAF, and Triad criticisms of ADR are unfounded.[4]

5  Although, as discussed above, this evidence is pertinent to the

6  question of bias, this court cannot consider any such evidence for

7  purposes of analyzing whether Blue Shield abused its discretion

8  Abatie, 458 F.3d at 970.  At the same time, however, it is unclear

9  to the court whether all of Blue Shield's evidence is itself

10  admissible.  As Blue Shield acknowledged at argument, the scope of

11  an administrative record in a class action regarding a blanket

12  policy is somewhat different than in a traditional, single-

13  plaintiff action for disability benefits.  Blue Shield acknowledges

14  that it did its best to submit relevant excerpts from all of the

15  relevant medical policies, the evidence underlying those policies,

16  assessment criteria and conclusions, and "some very minimal

17  deposition testimony."

18      Plaintiff, in response to Blue Shield's objections to

19  Plaintiff's introduction of extra-record evidence on the merits,

20  contends that Blue Shield, too, relies upon extra-record evidence.

21  This court cannot determine, on the record and briefing currently

22  before it, the confines of the administrative record or whether all

23  of the evidence submitted falls within them.  See Abatie, 458 F.3d

24  at 970; Montour, 588 F.3d at 632 n.4. ("In the ERISA context, the

25

26      [4] Although Plaintiff's assertions that BCBSA failed to follow
27  its own internal guidelines, and that Blue Shield blindly adopted
   BCBSA findings without any review may be supportable with evidence
28  within the record, Plaintiff does not support these arguments with
   any citation to the record.  (Opp. at 20.)

1  administrative record consists of the papers the insurer had when

2  it denied the claim."); <u>Opeta v. Northwest Airlines Pension Plan</u>

3  <u>for Contract Employees</u>, 484 F.3d 1211, 1217 (9th Cir. 2007)

4  (explaining, in context of de novo review, that "a district court

5  should not take additional evidence merely because someone at a

6  later time comes up with new evidence . . . . [I]n most cases, only

7  the evidence that was before the plan administrator at the time of

8  determination should be considered." (internal quotations and

9  citation omitted)); <u>but see</u> <u>Burke</u>, 544 F.3d at 1028 ("[T]he

10  district court may consider outside the administrative record if it

11  determines that procedural irregularities prevented the full

12  development of the administrative record.").

13      Thus, despite Blue Shield's evidence that it did not abuse its

14  discretion and Plaintiff's lack of intra-record evidence, the court

15  must deny Blue Shield's motion insofar as it relates to the

16  decision on the merits because (1) triable issues remain regarding

17  the extent and effect of Blue Shield's structural bias and (2) it

18  is unclear whether the evidence upon which Blue Shield relies is

19  part of the administrative record to which this Court must limit

20  its merits review.

21  //

22  //

23  //

24  //

25  //

26  //

27  //

28  //

**IV.   Conclusion**

For the reasons stated above, Defendant's Motion for Summary Judgment is GRANTED in part and DENIED in part.  The motion is granted insofar as it seeks a determination that abuse of discretion is the proper standard of review.  The motion is denied in all other respects.

IT IS SO ORDERED.

Dated: July 29, 2016

                                        DEAN D. PREGERSON
                                        United States District Judge